Please call me or have your staff contact Carmela Dyer if you have further questions.
With best wishes,

Sincerely,
ROBERT F. HALE

(For Edward M. Gramlich, Acting Director).

REGULATORY IMPACT STATEMENT

Paragraph 11(b) of rule XXVI of the Standing Rules of the Senate requires each report accompanying a bill to evaluate the regulatory and paperwork impact that would be incurred in carrying out the provisions of the bill.
The Committee believes that S. 1703 will have minimal regulatory or paperwork impact.

EXECUTIVE COMMUNICATIONS

The Committee requested a legislative report on S. 1703 from the Department of the Interior and the Department of Health and Human Services. The Committee has not received a legislative report on S. 1703 from the Department of the Interior or the Department of Health and Human Services. Therefore, the Committee has inserted in lieu of a legislative report the testimony on S. 1703 provided by the Department of the Interior and the Department of Health Services at the Committee hearing on October 2, 1987. The Committee has also included a letter from the Department of Justice regarding S. 1703.

****2662 *43** STATEMENT OF ROSS O. SWIMMER, ASSISTANT SECRETARY--INDIAN AFFAIRS, DEPARTMENT OF THE INTERIOR, BEFORE THE HEARING OF THE SELECT COMMITTEE ON INDIAN AFFAIRS, UNITED STATES SENATE, ON S. 1703, THE "INDIAN SELF-DETERMINATION AND EDUCATION ASSISTANCE ACT AMENDMENTS OF 1987"--OCTOBER 2, 1987

Mr. Chairman and members of the Committee, I am pleased to present the views of the Department of the Interior on S. 1703, the "Indian Self-Determination and Education Assistance Act Amendments of 1987".
We could only support S. 1703 if it were amended to address our concerns as detailed in this testimony. We plan to submit an alternative proposal for amending the act in the near future.
Before dealing with some of the specifics involved in tribal-BIA contracting I believe it is appropriate to step back for a moment to consider what we wish to accomplish. The enactment of the Indian Self-Determination Act in January of 1975 was the end result of President Nixon's July 1970 Message to the Congress on Indian Policy which called for tribes to be given the opportunity to assume responsibilities and control over programs operated for their benefit by the Bureau of Indian Affairs (BIA) and the Indian Health Service (IHS).
We now find ourselves in what sometimes seems to be a quagmire of conflicting laws, rules, regulations and policies trying to carry out what was a fairly straight forward and clear objective in President Nixon's Message, that is to transfer responsibility and funds at the tribes request to operate federally funded programs intended for their benefit.

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

Most of the problems are associated with the mechanism used in providing the tribes with the Federal funds. Apparently, in response to concerns that the turn over of programs and services to tribes could be followed by a cut off of the Federal funding, contracts were chosen as the mechanism for those turnovers. The reasoning apparently was that contracts are used in connection with a Federal agency's carrying out a Federal responsibility while grant agreements are associated with Federal aid in carrying out someone else's responsibilities and cooperative agreements are used in jointly carrying out a responsibility. Therefore, it apparently seemed to follow that the use of contracts provides a basis, or an additional basis, for continued Federal funding because it is clearer that Federal responsibilities are being carried out.

I do not believe that the use of the term "contract" provides any assurance against budget cuts or any guarantee of continued funding. It is notable that in the budgeting and appropriations process for BIA, no distinctions are made between contracted and non-contracted funds, nor is special consideration given to the degree to which a given program is contracted. However, the use of the contract mechanism has unintentionally caused the development of problems. Among the problems at least partially due to the contracting mechanism are the unproductive and time consuming annual renewal or recontracting process and the delays in the determination of contract amounts while final appropriation amounts are being determined and allocated in accordance with Appropriations and Conference Committee Reports.

****2663 *44** Another problem is the BIA's need to monitor the contractor while the contract is being carried out because of the BIA's continuing responsibility to ensure compliance with detailed contract terms. To be able to do this the BIA may retain part of the budgeted funds for program operations that might otherwise be included in the contract amount.

Still another problem is indirect cost determinations, budgeting and funding for indirect costs, and the spiral of debt that can afflict tribes due to theoretical overrecoveries of costs. This problem is further complicated by tribal governments' dependence on the use of indirect cost funding to support more of a tribal government's expenses than the expenses the tribe incurs solely because of the contract.

One way of trying to deal with these problems is to continue to try to modify the Federal contracting mechanism to streamline it and make it more in line with the purpose intended. This is what S. 1703 is intended to do, and the attachment to my prepared statement provides our detailed comments on that bill. However, it is increasingly obvious that contracting is too unwieldy to promote true self-determination. For this reason I believe that a more basic change may be needed and that the time is appropriate to actively consider it. We are currently developing an extensive legislative proposal to fix what we view as the problems with Public Law 93-638. We plan to submit our proposal to the Congress within the next six weeks. We respectfully request that the Committee withhold action on S. 1703 until it has the chance to review our proposal.

I realize that a basic restructuring of Public Law 93-638 would be a tremendous undertaking, with actual implementation requiring several years, but I am convinced that our experience makes it clear that we have created too many barriers to true self-determination by relying on the mechanism of contracting. There must be incentives for tribal governments to run their own programs and for the BIA to transfer the programs through a sensible and manageable system. I do not believe that a few amendments to the existing law will solve the problems; it is time to consider a new process. We would be pleased to work with the Committee in consultation with Indian tribes, to develop legislative provisions along the lines

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

I have outlined we will be proposing.

This concludes my prepared statement and I will be pleased to respond to the Committee's questions.

DEPARTMENT OF THE INTERIOR DETAILED COMMENTS ON S. 1703, THE "INDIAN SELF-DETERMINATION AND EDUCATION ASSISTANCE ACT AMENDMENTS OF 1987"

1. We have no comments on section 101 of S. 1703 which provides the short title and a table of contents for the bill.

2. Section 102 modifies the declaration of policy now in section 3(b) (25 U.S.C. 450a(b)) of the Indian Self-Determination and Education Assistance Act (hereinafter referred to as "the Act") to clarify that the Federal responsibility is to "individual Indian tribes and to the Indian people as a whole" rather than to "the Indian people". It also adds "In accordance with this policy the United ****2664 *45** States is committed to supporting and assisting Indian tribes in the development of strong and stable tribal governments, capable of administering quality programs and developing the economies of their respective communities." We have no objections.

3. Section 103 amends section 4 (25 U.S.C. 450b) of the Act to add eight definitions and change a definition.

The term "construction programs" is added and defined to mean "programs for the planning, design, construction, repair, improvement and expansion of buildings or facilities but not limited to, housing, sanitation, roads, schools, administration and facilities, irrigation and agricultural works and water conservation, flood control, or port facilities".

(a) The word "including" is apparently missing after "facilities" the first time it appears (page 3, line 13).

(b) The definition apparently extends to activities usually considered as operation and maintenance of facilities as distinguished from true construction and renovation. We believe that the ongoing operation and maintenance of facilities is and should be contractible under the Act.

(c) The definition is included because of a later amendment (page 7, line 2) to section 102 of the Act to expressly include "construction programs" as contractible under the Act. Although we support the concept of allowing tribes to contract for the planning, design, and construction of projects, we believe such contracting should be done as a business activity so the tribe could make a profit and manage the contract appropriately. Contracting for construction under Public Law 93-638 is really not appropriate since it is designed to enable tribes to operate on-going programs whereas construction projects for a given tribe are infrequent and limited in duration. Moreover, contracting construction under Public Law 93-638 with all the attendant complexities of indirect cost-negotiation and payment would inevitably result in cost inflation. This inflation would reduce the amount of construction that could be done to benefit Indian people.

4. Sections 103 also amends section 4 of the Act to provide definitions for the terms "contract costs", "contract funding base", "direct program costs", "indirect costs", and "indirect cost rate". These terms are dealt with in connection with the sections where the terms are use.

5. Section 103 also amends section 4 of the Act to define the term "mature contract" (page 4, line 19) to mean "a self-determination contract that has been continuously operated by an Indian tribe or tribal organization for three or more years, and for which there has been no significant and material audit exceptions in the annual financial audit of such Indian tribe or tribal organization".

This definition includes the first two of several uses in the bill of the phrase

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.