# In the United States Court of Federal Claims

No. 07-195 C
(Filed: November 12, 2009)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| DARRELL BOYE et al., | * | RCFC 12(b)(1); RCFC 12(b)(6); Third- |
| | * | Party Beneficiaries; Self-Determination |
| Plaintiffs, | * | Contracts; Law Enforcement and Criminal |
| | * | Investigation Services; Statute of |
| v. | * | Limitations; Continuing Claim Doctrine; |
| | * | Indian Law Enforcement Reform Act; |
| THE UNITED STATES, | * | Indian Self-Determination and Education |
| | * | Assistance Act; Claim Preclusion |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Edward D. Fitzhugh, Tempe, AZ, for plaintiffs.

Christopher Bowen, United States Department of Justice, Washington, DC, for defendant.

### OPINION AND ORDER

**SWEENEY**, Judge

In the above-captioned action, plaintiffs allege that they have not been paid the wages and benefits to which they are entitled pursuant to various self-determination contracts executed by their employer, the Navajo Nation, and the United States Department of the Interior ("Department of the Interior"). They bring their claim as purported third-party beneficiaries. Defendant has moved to dismiss the complaint for lack of jurisdiction and for failure to state a claim upon which relief could be granted pursuant to Rule 12 of the Rules of the United States Court of Federal Claims ("RCFC"). As explained in more detail below, the court grants defendant's motion.

# I. BACKGROUND[1]

The Bureau of Indian Affairs ("BIA") of the Department of the Interior is responsible for providing law enforcement on the Navajo Reservation. Am. Compl. ¶¶ 7, 9. To fulfill the BIA's responsibility, the Department of the Interior executes contracts for law enforcement and criminal investigation services with the Navajo Nation. Id. Such contracts are referred to as "638 contracts."[2] Id. ¶ 7. The 638 contracts were generally awarded for multiple-year terms, but amended on an annual basis for funding purposes.[3] See, e.g., DA 34, 41, 101; SA 2, 13, 24, 35, 47, 59, 71, 87, 101, 115, 127, 139. The contracts were awarded by an Awarding Official, who, in turn, designated an Awarding Official's Technical Representative to administer them. See, e.g., SA 2, 13, 24, 35, 47, 59, 71, 87, 101, 115, 127, 139; see also DA 27-29 (containing a Memorandum of Designation defining the "scope of authority, duties, and responsibilities" of the Awarding Official's Technical Representative). Each contract and annual amendment

---

[1] The court derives the facts in this section from the amended complaint ("Am. Compl."). The amended complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." PSI Energy, Inc. v. United States, 59 Fed. Cl. 590, 597 n.8 (2004), rev'd on other grounds, 411 F.3d 1347 (Fed. Cir. 2005); see also RCFC 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); 2 James Wm. Moore et al., Moore's Federal Practice ¶ 12.34[2] (3d ed. 2006) ("In deciding whether to dismiss, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which the judge may take judicial notice."). Because plaintiffs allege the breach of certain, specified contracts, the court derives additional facts from defendant's appendix ("DA") and supplemental appendix ("SA"), which include the relevant contracts.

[2] The reference is derived from the number of the law enacted by Congress that provided for the execution of the contracts–the Indian Self-Determination and Education Assistance Act, Pub. L. No. 93-638, 88 Stat. 2203 (1975).

[3] For simplicity, the court refers to the contracts and annual amendments collectively as the "638 contracts." See also DA 41 (noting that while the term of the contract was three years, "upon the election by the [Navajo Nation], the period of this Contract shall be determined on the basis of a calendar year").

incorporated a model contract, an annual funding agreement, and a statement of work.[4]  See, e.g., DA 39-40, 55, 62, 73, 91, 107, 122; SA 3, 14, 25, 36, 48, 60, 72, 88, 102, 116, 128, 140.

Pursuant to the model contracts, the purpose of the 638 contracts was to transfer funding for, and responsibility to perform, law enforcement and criminal investigation services from the United States to the Navajo Nation.  See, e.g., DA 40.  To further this purpose, the provisions of the contract were to be "liberally construed" for the benefit of the Navajo Nation.  Id.  The Navajo Nation was not required to expend more money for the designated services than was obligated under the contract and, after notice to the Secretary of the Department of the Interior ("Secretary of the Interior"), could suspend work under the contract for lack of funds.  Id. at 42.  Moreover, unless otherwise provided by law, the Navajo Nation was not bound by the "program guidelines, manuals, or policy directives" of the Secretary of the Interior.  Id. at 47.

The annual funding agreements provided that "[t]he Navajo Nation shall administer the programs identified in the Statement of Work . . . during the term of this [annual funding agreement] in accordance with the provisions of the Contract and the [annual funding agreement] . . . ."  Id. at 55; accord id. at 74, 108.  The agreements indicated that along with the funding awarded under the 638 contracts, the Navajo Nation received program funding from other sources.  Id. at 56; accord id. at 75, 109.  They also provided that "all personnel employed by the Navajo Nation under [the annual funding agreements] will adhere to applicable Navajo Nation personnel policies and procedures, including . . . pay schedules and pay tables."  Id. at 59; accord id. at 79, 113.  Further, the annual funding agreements indicated that, "[f]or purposes of Federal Tort Claims Act coverage, the Navajo Nation and its employees are deemed to be employees of the Federal government while performing work under this contract."  Id. at 60, 85, 119.  Finally, the model contracts and some of the annual funding agreements provided that the BIA was required to perform an annual performance monitoring visit.  See, e.g., id. at 45, 84, 118.

The statements of work in the law enforcement contracts covering 2002 through 2007 contained the following provisions:

101.  The Contractor [, i.e., the Navajo Nation,] shall perform the following Bureau program: LAW ENFORCEMENT SERVICES.  Subject to the terms of the contract, the Annual Funding Agreement (AFA), and availability of funds, the

---

[4]  The model contract is required by statute, 25 U.S.C. § 450l(a)(1) (2006), must contain certain, specified provisions, id. § 450l(c), and must incorporate an annual funding agreement, id. The record before the court contains only one model contract (for the law enforcement contract covering 2002) and three annual funding agreements (for the law enforcement contracts covering 2002 and 2007 and the criminal investigation contract covering 2007).  See DA 39-61, 73-86, 107-120.  The court assumes, for the purposes of ruling on defendant's motion to dismiss, that these model contracts and annual funding agreements are representative of the documents from other years.

Contractor shall perform police law enforcement activities as noted in the Indian Law Enforcement Reform Act . . . within Navajo Indian Country . . . .

. . . .

102.  Personnel.  The Contractor shall perform the contracted law enforcement program in accordance with the qualifications, training, code of conduct, inspection and evaluation, and other standards applicable to Bureau law enforcement personnel, or the equivalent.  . . .

. . . .

106.  Salaries.  Salaries paid law enforcement officers by the Contractor under this Contract shall be equal to or greater than the salaries paid law enforcement officers with similar responsibilities employed directly by the Bureau of Indian Affairs.

107.  Reporting.  The Contractor shall prepare and submit the following reports to the Contracting Officer's Representative:

. . . .

B.  Internal Reporting Procedures.

The Contractor will maintain the following information as part of its performance of this Contract, but will not submit this information.  However, this information will be available for inspection during the Bureau's yearly monitoring visit:

. . . .

8.  Payroll records of all employees[.]

SA 3-4, 8-10, 14-15, 19-21, 25-26, 30-32, 36-37, 42-43, 48-49, 54-56, 60-61, 66-68.  Similarly, the statements of work in the criminal investigation contracts for the same years provided:

101.  The Contractor [, i.e., the Navajo Nation,] shall perform the following Bureau program: CRIMINAL INVESTIGATIONS SERVICES.  Subject to the terms of the Contract, the Annual Funding Agreement, and availability of funds, the Contractor shall perform criminal investigation services as noted in the Indian Law Enforcement Reform Act . . . within Navajo Indian Country . . . .[5]

---

[5]  In the contracts covering 2004 through 2007, the opening paragraph included the notation "(AFA)" after "Annual Funding Agreement."  SA 102, 116, 128, 140.  Further, the

. . . .

102.  Personnel.  The Contractor shall perform the contracted criminal investigation program in accordance with the qualification, training, code of conduct, inspection and evaluation, and other standards applicable to Bureau criminal investigations personnel, or the equivalent.[6] . . .

. . . .

106.  Salaries.  Salaries paid criminal investigators by the Contractor under this Contract shall be equal to or greater than the salaries paid criminal investigators with similar responsibilities employed directly by the Bureau of Indian Affairs.[7]

. . . .

REPORTING

The Contractor shall prepare and submit the following reports to the Contracting Officer's Representative:[8]

. . . .

B.  Internal Reporting Procedures.

The Contractor will maintain the following information as part of its performance of this Contract, but will not submit this information.  However, this information will be available for inspection during the Bureau's yearly monitoring visit:

---

opening paragraph of the contract covering 2004 substituted "with" for "within."  Id. at 102. Finally, in the contracts covering 2005 through 2007, the opening paragraph substituted "Navajo Nation" for "Navajo Indian Country."  Id. at 116, 128, 140.

[6] In the contracts covering 2004 through 2007, the "Personnel" provision omitted the word "program," added an "s" at the end of "qualification," and substituted "investigator personnel" for "investigations personnel."  SA 106, 119, 131, 143.

[7] In the contracts covering 2006 and 2007, the following citation was appended to the "Salaries" provision: "(25 CFR § 12.33 - 12.34)."  SA 135, 177.

[8] In the contracts covering 2005 through 2007, "Contract" is substituted for "Contractor." SA 123, 135, 147.

. . . .

    8.  Payroll records of all employees[.][9]

Id. at 72, 77, 82-83, 88, 93, 97a-98,[10] 102, 106, 110-11, 116, 119, 122-24, 128, 131, 135-36, 140, 143, 147-48 (footnotes added).  With respect to third-party beneficiaries, the statements of work in five of the six law enforcement contracts (all but the contract in effect during 2002) and the criminal investigation contracts covering 2006 and 2007 provided:

    109.  No Third-Party Beneficiary.  This contract does not and is not intended to create rights in any person(s) or entities other than the contracting parties.

Id. at 22, 33, 45, 57, 69, 137, 149.

    Plaintiffs are current and former employees of the Navajo Nation Division of Public Safety ("Navajo DPS"), most of whom reside within the Navajo Reservation in Arizona.  Am. Compl. ¶¶ 4-5.  In their complaint, originally filed on March 23, 2007, and later amended to add new plaintiffs on July 27, 2007, plaintiffs allege that they did not receive, or are not receiving, wages and benefits equal to the wages and benefits paid to their BIA counterparts, as required by the relevant 638 contract.  Id. ¶¶ 11-18.  Indeed, one of the plaintiffs contends that Navajo DPS law enforcement officers are paid between $25,396 and $35,734 and Navajo DPS criminal investigators are paid between $35,734 and $42,432, while their BIA counterparts are paid between $27,528 and $46,314, and between $34,678 and $70,555, respectively.  Am. Compl. Ex. A ¶¶ 6-7.  Accordingly, plaintiffs allege that defendant has breached the relevant 638 contracts, as well as the underlying regulatory framework, by failing to investigate whether the Navajo Nation was in contract compliance and by failing to ensure that plaintiffs received their contractually mandated wages and benefits from the Navajo Nation.  Am. Compl. ¶¶ 13-18.  Plaintiffs assert that their breach of contract claim is based on their purported status as third-party beneficiaries of the 638 contracts between the Navajo Nation and the Department of the Interior.  Id. ¶ 14.  They seek an accounting and payment of all amounts due to them, costs, attorney's fees, interest, and "such other and further relief as the court deems just and proper."  Am. Compl. Wherefore ¶¶ 1-5.

--------

    [9]  In the contracts covering 2006 and 2007, this item is numbered "6" instead of "8."  SA 136, 148.

    [10]  The page containing the "Salaries" provision from the criminal investigation contract covering 2003 was omitted from defendant's supplemental appendix.  Defendant subsequently filed the missing page at the court's request, but did not mark it with a supplemental appendix page number.  Since the missing page should have appeared after page 97 of the supplemental appendix, the court assigned it page number 97a.

Defendant moves to dismiss plaintiffs' complaint on three grounds. First, defendant contends that this court lacks jurisdiction over plaintiffs' breach of contract claim because plaintiffs are not intended third-party beneficiaries of the 638 contracts. Second, defendant argues that even if plaintiffs were intended third-party beneficiaries of the 638 contracts, they have failed to state a claim upon which the court could grant relief because the remedy for the breach of contract they allege is specific performance, which is not available in this court. Finally, defendant seeks dismissal of plaintiffs' complaint based on the doctrine of claim preclusion. The court heard argument on November 9, 2009.

## II.  STANDARD OF REVIEW

Defendant has moved to dismiss plaintiffs' complaint pursuant to RCFC 12. In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiffs' favor. Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). With respect to RCFC 12(b)(1), plaintiffs bear the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction. McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988). The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction. Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747. If the court finds that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

If the court finds that it possesses jurisdiction to entertain one or all of plaintiffs' claims, it still must dismiss those claims that fail to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). The United States Supreme Court ("Supreme Court") clarified the degree of specificity with which a plaintiff must plead facts sufficient to survive such a motion in Bell Atlantic Corp. v. Twombly, stating that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. 544, 555 (2007) (citation omitted). The Supreme Court explained that although a complaint need not contain "detailed factual allegations," the "factual allegations must be enough to raise a right to relief above the speculative level . . . ." Id. In other words, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp., 550 U.S. at 556). Allegations constituting a "sheer possibility" of defendant's liability or that are "'merely consistent with' a defendant's liability" are not sufficient. Id. (quoting Bell Atl. Corp., 550 U.S. at 557). Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

(citing Bell Atl. Corp., 550 U.S. at 555).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."[11]  Bell Atl. Corp., 550 U.S. at 563.  Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## III.  SUBJECT MATTER JURISDICTION

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).  Further, "[w]hen waiver legislation contains a statute of limitations, the limitations provision constitutes a condition on the waiver of sovereign immunity."  Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983).

Plaintiffs assert jurisdiction under both 28 U.S.C. § 1491 ("Tucker Act") and 28 U.S.C. § 1505 ("Indian Tucker Act").  The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims possesses jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States.  28 U.S.C. § 1491(a)(1) (2006).  The Indian Tucker Act further provides that the Court of Federal Claims possesses jurisdiction over claims brought by "any tribe, band, or other identifiable group of American Indians" against the United States that are founded upon "the Constitution, laws or treaties of the United States, or Executive orders of the President," as well as claims that "otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe, band or group."  Id. § 1505.  However, the Tucker Act and the Indian Tucker Act are merely jurisdictional statutes, and do not create "a substantive right enforceable against the Government by a claim for money damages."  United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003).

---

[11]  In so holding, the Supreme Court determined that the "no set of facts" language set forth in Conley v. Gibson, 355 U.S. 41, 45 (1957), "has earned its retirement," Bell Atl. Corp., 550 U.S. at 563.

Instead, the substantive right must arise from another source of law, <u>United States v. Mitchell</u>, 463 U.S. 206, 216 (1983), that, in general, "'can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained,'" <u>United States v. Testan</u>, 424 U.S. 392, 400 (1976) (quoting <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1009 (Ct. Cl. 1967)); <u>see also</u> <u>Lovelladies Harbor, Inc. v. United States</u>, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc) (holding that the other source of law might be a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States"). To make such a showing, a plaintiff must only demonstrate that the substantive source of law is "reasonably amenable to the reading that it mandates a right of recovery in damages." <u>White Mountain Apache Tribe</u>, 537 U.S. at 473. In sum, "[w]hile the premise to a Tucker Act claim will not be 'lightly inferred,' a fair inference will do." <u>Id.</u> (citation omitted).

## IV.  STATUTE OF LIMITATIONS

As a preliminary matter, the court is obliged to address plaintiffs' allegation "[t]hat Defendant's breach of the contractual and regulatory provisions regarding Plaintiffs' rate of pay, and payment of other benefits, was, and is, of a continuing nature for which the statute of limitations has no application." Am. Compl. ¶ 16. Plaintiffs' complaint is subject to the six-year statute of limitations set forth in sections 2401(a) and 2501 of title twenty-eight of the United States Code.[12] <u>See</u> 28 U.S.C. §§ 2401(a) ("Except as provided by the Contract Disputes Act of

---

[12] Section 2401 finds its roots in the first section of the Tucker Act. <u>See</u> Act of Mar. 11, 1887, ch. 359, § 1, 24 Stat. 505, 505 ("[N]o suit against the Government of the United States[] shall be allowed under this act unless the same shall have been brought within six years after the right accrued for which the claim is made."). The limitations provision applied to claims brought in the United States Court of Claims ("Court of Claims") and claims brought in the district courts of the United States, which had concurrent jurisdiction over those claims for less than $1,000. <u>See id.</u> § 2. Subsequently, in 1911, the limitations provision from the Tucker Act was codified in the Judicial Code in the chapter titled "District Courts–Jurisdiction." <u>See</u> Act of Mar. 3, 1911, ch. 231, § 24(20), 36 Stat. 1087, 1093. The provision was placed in the paragraph describing the district courts' concurrent jurisdiction with the Court of Claims over claims for less than $10,000. <u>Id.</u> When the laws of the United States were consolidated and codified into one code in 1926, the limitations provision remained in the paragraph concerning the district courts' concurrent jurisdiction with the Court of Claims that appeared in the chapter generally describing the district courts' jurisdiction. <u>See</u> Act of June 30, 1926, ch. 712, 44 Stat. 777 (codified at 28 U.S.C. § 41(20) (1926)). The limitations period was finally codified at its present location in 1948. <u>See</u> Act of June 25, 1948, ch. 646, 62 Stat. 869, 971 (codified at 28 U.S.C. § 2401(a) (1946 & Supp. II 1949)). It was decoupled from the concurrent jurisdiction language, which was retained in the chapter concerning the jurisdiction of district courts, <u>see id.</u> §1, 62 Stat. at 933 (codified at 28 U.S.C. § 1346(a) (1946 & Supp. II 1949)), and relocated into the chapter titled "United States as Party Generally," <u>id.</u> § 1, 62 Stat. at 971. <u>Cf. id.</u> § 33, 62 Stat. at 991 (noting

1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues."), 2501 ("Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."). The Supreme Court has held that section 2501 provides an "absolute" limit on the ability of the Court of Federal Claims to reach the merits of a case. John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 753-54 (2008). Because the language and meaning of section 2401 is substantially similar to section 2501, it also limits this court's jurisdiction. See Georgalis v. U.S. Patent & Trademark Office, 296 Fed. App'x 14, 16 (Fed. Cir. 2008) (per curiam) (unpublished) ("While we are presented with a different statute in this case–§ 2401 rather than § 2501–we conclude that the Supreme Court's rationale applies with equal force because both are 'jurisdictional' statutes of limitations.").

"A claim first accrues within the meaning of the statute of limitations when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Brown Park Estates-Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1455 (Fed. Cir. 1997) (internal quotation marks omitted). In this case, plaintiffs emphasize the "continuing nature" of the government's purported breach, which the court interprets as an allegation that the United States breached the relevant 638 contract each time a plaintiff was paid by the Navajo Nation. Thus, plaintiffs contend that, under the continuing claim doctrine, they can recover for each and every purported breach, regardless of when that contract was executed by the

--------------------

that "[n]o inference of a legislative construction is to be drawn" by where "any section is placed" within title 28).

Section 2501 finds its roots in a statute enacted in 1863, which amended the 1855 statute establishing the Court of Claims. See Act of Mar. 3, 1863, ch. 92, § 10, 12 Stat. 765, 767 ("[E]very claim against the United States, cognizable by the court of claims, shall be forever barred unless the petition setting forth a statement of the claim be filed in the court or transmitted to it under the provisions of this act within six years after the claim first accrues[.]"). This limitations provision was published in the 1874 Revised Statutes, a compilation of statutes in force as of December 1, 1873, see Act of June 20, 1874, ch. 333, 18 Stat. 113, in the chapter concerning the jurisdiction, powers, and procedure of the Court of Claims, see Rev. Stat. § 1069 (1874). It was then codified in the Judicial Code in 1911, appearing in the chapter concerning the Court of Claims. See Act of Mar. 3, 1911, ch. 231, § 156, 36 Stat. at 1135, 1139. With the 1926 codification of the laws of the United States, the limitations provision remained in the chapter concerning the Court of Claims. See Act of June 30, 1926, 44 Stat. at 777 (codified at 28 U.S.C. § 262 (1926)). It was finally codified at its present location in 1948 in the chapter concerning Court of Claims–now Court of Federal Claims–procedure. See Act of June 25, 1948, ch. 646, 62 Stat. at 975-76 (codified at 28 U.S.C. § 2501 (1946 & Supp. II 1949)). Cf. id. § 33, 62 Stat. at 991 (noting that "[n]o inference of a legislative construction is to be drawn" by where "any section is placed" within title 28).

-10-

Department of the Interior and the Navajo Nation.  Plaintiffs' understanding of the continuing claim doctrine is flawed.

The continuing claim doctrine was explained by the Court of Claims in <u>Friedman v. United States</u>:

> Over the years, the court's pay cases (military and civilian) concerned with the issue of limitations have often applied the so-called 'continuing claim' theory, i.e., periodic pay claims arising more than six years prior to suit are barred, but not those arising within the six-year span even though the administrative refusal to pay the sum claimed may have occurred, or the statute on which the claim is grounded may have been enacted, prior to six years.  . . .  The important characteristics of all these cases were: (a) Congress had not entrusted an administrative officer or tribunal with the determination of the claimant's eligibility for the particular pay he sought; (b) the cases turned on pure issues of law or on specific issues of fact which the court was to decide for itself . . . ; and (c) in general the cases called upon the court to resolve sharp and narrow factual issues not demanding judicial evaluation of broad concepts . . . .  For such cases . . . the 'continuing claim' doctrine is wholly appropriate and in accord with the general jurisprudence in this country on the statute of limitations.  Under those general principles the cause of action for pay or compensation accrues as soon as the payor fails or refuses to pay what the law (or the contract) requires; there is no other condition precedent to the accrual of the cause of action (such as a factual determination by an executive tribunal or the exhaustion of some special procedure or remedy).  And where the payments are to be made periodically, each successive failure to make proper payment gives rise to a new claim upon which suit can be brought.

310 F.2d 381, 384-85 (Ct. Cl. 1962) (footnote omitted).  Thus, the continuing claim doctrine applies when a claim is "inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages." <u>Brown Park Estates-Fairfield Dev. Co.</u>, 127 F.3d at 1456.  Indeed:

> The continuing claims doctrine often operates to save parties who have pled a series of distinct events–each of which gives rise to a separate cause of action–as a single continuing event.  In such cases, the continuing claims doctrine operates to save later arising claims even if the statute of limitations has lapsed for earlier events.

<u>Ariadne Fin. Servs. Pty. Ltd. v. United States</u>, 133 F.3d 874, 879 (Fed. Cir. 1998).

Here, plaintiffs allege that the United States breached the relevant 638 contract each time a plaintiff was paid by the Navajo Nation.  Because each payment by the Navajo Nation

represents one of a series of independent events, the continuing claim doctrine applies in this case. However, the doctrine does not operate to resurrect plaintiffs' claims for pay under each and every 638 contract for which they were purportedly shortchanged. Rather, it allows plaintiffs to maintain those claims that accrued within the six-year period prior to filing their complaint, regardless of when the underlying 638 contract was executed. Thus, to the extent that plaintiffs seek to recover pay and benefits allegedly owed to them before March 23, 2001, those claims are barred by the statute of limitations.

## V.  THE STATUTES AND REGULATIONS

Plaintiffs cite several statutes and regulations as providing the basis for jurisdiction in the Court of Federal Claims. As noted above, plaintiffs' mere invocation of the Tucker Act and the Indian Tucker Act is insufficient to establish jurisdiction;[13] rather, reliance upon a separate, money-mandating source of law is also required. Accordingly, in the "Jurisdiction" portion of their complaint, plaintiffs cite two additional statutes:[14] 25 U.S.C. § 2802 and 25 U.S.C. § 450f.[15] Am. Compl. ¶¶ 7-8. These statutes were enacted as part of the Indian Law Enforcement Reform Act and the Indian Self-Determination and Education Assistance Act, respectively. See Pub. L. No. 101-379, 104 Stat. 473 (1990) (codified as amended at 25 U.S.C. §§ 2801-2809 (2006) and 42 U.S.C. § 2991a note (2006)); Pub. L. No. 93-638, 88 Stat. at 2203 (relevant provisions codified as amended at 25 U.S.C. §§ 450 to 450bbb-2). In addition, elsewhere in their complaint, plaintiffs cite several regulations promulgated pursuant to the Indian Law Enforcement Reform Act: 25 C.F.R. §§ 12.33-.34, .62.[16] Am. Compl. ¶¶ 11, 15.

---

[13] In addition, the Indian Tucker Act applies only to tribal plaintiffs and not individual tribal members. See Fields v. United States, 423 F.2d 380, 383 (Ct. Cl. 1970) ("[S]ince the instant case is one brought by individual Indians and not a tribe, band, or identifiable group of Indians, we feel that defendant is correct in asserting that section 1505 does not apply to the present case.").

[14] Plaintiffs also cite a third statute, the Fair Labor Standards Act of 1938 ("FLSA"). Am. Compl. ¶ 8. However, in their response in opposition to defendant's motion to dismiss, they clarify that they are not alleging a claim under the FLSA in this case. Thus, the court need not address this statute.

[15] Although plaintiffs refer to the latter statute as "25 U.S.C. § 450(f)," it is clear that they mean "25 U.S.C. § 450f" because there is no section 450(f).

[16] Plaintiffs do not specifically cite 25 C.F.R. § 12.34. Rather, they indicate that the rule requiring Navajo DPS employees to be paid at a rate equal to their BIA counterparts appears in "25 CFR 12.33 et seq." Am. Compl. ¶ 11. Because the rule appears in 25 C.F.R. § 12.34, the court presumes that plaintiffs are also referring specifically to this section.

## A.  The Indian Law Enforcement Reform Act and Associated Regulations

Congress enacted the Indian Law Enforcement Reform Act in 1990 "to clarify and strengthen the authority of the law enforcement personnel and functions within the [BIA] of the Department of Interior for law enforcement activities."  S. Rep. No. 101-167, at 4 (1990).  As one of the provisions of that Act, 25 U.S.C. § 2802 provides that the BIA "shall be responsible for providing, or for assisting in the provision, of law enforcement services in Indian country . . . ."[17]  25 U.S.C. § 2802(a).  It creates a Division of Law Enforcement Services ("Division") to carry out these services.  Id. § 2802(b).  And, it requires that positions in the Division be classified in grades "comparable to those for other Federal law enforcement personnel in other Federal Agencies . . . ."  Id. § 2802(e)(3).  However, nowhere does it address individuals who are not Division employees, such as plaintiffs, much less mandate the payment of money to those individuals.  Accordingly, section 2802 is not a substantive, money-mandating source of law that can provide this court with jurisdiction over plaintiffs' complaint.[18]

Similarly, the regulations promulgated pursuant to the Indian Law Enforcement Reform Act do not establish jurisdiction in this court.  The first regulation cited by plaintiffs–25 C.F.R. § 12.33–provides:

---

[17]  "Indian country" is:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

18 U.S.C. § 1151 (2006), cited in 25 U.S.C. § 2801(4).

[18]  Although not cited in their complaint, plaintiffs argue that another provision of the Indian Law Enforcement Reform Act–25 U.S.C. § 2808–is a money-mandating source of jurisdiction for their claim.  Section 2808 provides, in its entirety: "Any expenses incurred by the Secretary under this chapter shall be paid from funds appropriated under section 13 of this title."  In other words, it authorizes the Secretary of the Interior to pay for law enforcement services from funds appropriated under the Snyder Act, 25 U.S.C. § 13.  Such a provision does not mandate the payment of money damages.  See also Samish Indian Nation v. United States, 419 F.3d 1355, 1366 (Fed. Cir. 2005) ("But the Supreme Court has already determined the Snyder Act does not provide a damage remedy because it does not require the expenditure of general appropriations, on specific programs, for particular classes of Native Americans.").

Are Indian country law enforcement officers paid less than other law enforcement officers?

An officer's pay is determined by his/her grade and classification.  The Commissioner of Indian Affairs must ensure that all BIA law enforcement officer positions are established at no lower grade level on the Federal scale than similar Federal law enforcement officer positions in other agencies.  No BIA position performing commissioned law enforcement duties will be classified in other than the GS 0083, police officer series, for uniformed officers and the GS 1811, criminal investigating series, for criminal investigators.

This regulation cannot reasonably be read to mandate the payment of money damages for individuals such as plaintiffs.  It clearly applies only to law enforcement officers employed directly by the BIA.  Moreover, it contains no language indicating that any individual could obtain money damages for a violation of the regulation.

The second regulation cited by plaintiffs–25 C.F.R. § 12.34–provides:

Do minimum salaries and position classifications apply to a tribe that has contracted or compacted law enforcement under self-determination?

Any contract or compact with the BIA to provide law enforcement services for an Indian tribe must require a law enforcement officer to be paid at least the same salary as a BIA officer performing the same duties.

As with 25 C.F.R. § 12.33, this regulation cannot reasonably be read to mandate the payment of money damages.  It merely provides that law enforcement and criminal investigation self-determination contracts include a particular contract provision.  It sets forth no monetary remedy for failure to include such a provision in a contract, much less a monetary remedy for a failure to comply with the regulation.

Finally, the third regulation cited by plaintiffs–25 C.F.R. § 12.62–provides:

Who decides what uniform an Indian country law enforcement officer can wear and who pays for it?

Each local law enforcement program must establish its own uniform requirements for patrol and detention personnel.  Uniformed BIA police officers may be paid an annual uniform allowance not to exceed $400.  Local programs may provide uniforms and related equipment to officers in lieu of this payment.  All law enforcement officers must also have their official identification on

their person at all times when performing law enforcement duties.  Uniforms,
when worn, will be plainly distinguishable from the uniforms of any non-law
enforcement personnel working on the reservation.

Again, this regulation cannot reasonably be read to mandate the payment of money damages.  It
merely requires the provision of a uniform or a uniform allowance to certain law enforcement
personnel.  There is no language indicating that any individual could obtain money damages for a
violation of the regulation.

Altogether, an examination of the three regulations cited by plaintiffs reflects that none of
them can be reasonably read to mandate the payment of money damages.  In fact, the court notes
that none of regulations promulgated pursuant to the Indian Law Enforcement Reform Act
mandates the payment of money damages.  See 25 C.F.R. §§ 12.1-.63.  In sum, the court does not
have jurisdiction over plaintiffs' complaint based upon the Indian Law Enforcement Reform Act
or its regulations.

### B.  The Indian Self-Determination and Education Assistance Act

Plaintiffs next contend that the Indian Self-Determination and Education Assistance Act
provides this court with jurisdiction over their complaint.  Congress enacted the Indian
Self-Determination and Education Assistance Act in 1975 to maintain:

the Federal Government's unique and continuing relationship with, and
responsibility to, individual Indian tribes and to the Indian people as a whole
through the establishment of a meaningful Indian self-determination policy which
will permit an orderly transition from the Federal domination of programs for, and
services to, Indians to effective and meaningful participation by the Indian people
in the planning, conduct, and administration of those programs and services.

25 U.S.C. § 450a(b); accord id. § 450.[19]  The first title of the Act constitutes the Indian Self-

---

[19]  In their response in opposition to defendant's motion to dismiss, plaintiffs contend that
the Court of Federal Claims in Carlow held that 25 U.S.C. § 450(a) was a money-mandating
source of jurisdiction.  Plaintiffs are mistaken.  In Carlow, the court was concerned solely with
whether the particular self-determination contract conferred jurisdiction under the Tucker Act; at
no time did it address whether any provision of the Indian Self-Determination and Education
Assistance Act constituted a money-mandating statute.  See generally Carlow v. United States,
40 Fed. Cl. 773 (1998).  The court only referred to section 450(a) in the following context:

The underlying statutory scheme of the Indian Self-Determination Act,
pursuant to which the BIA regulations were issued, provides support for plaintiffs'
contention that upon retrocession of the contract, the parties intended to substitute
the defendant in the place of the Tribe on the road construction project and that

Determination Act, which, among other things, provides for the execution of contracts between tribes and the federal government to plan, conduct, and administer programs for the benefit of Native Americans.  See Pub. L. No. 93-638, tit. I, §§ 101-102, 88 Stat. at 2206.  In fact, 25 U.S.C. § 450f, the specific provision cited by plaintiffs, directs the Secretary of the Interior, "upon the request of any Indian tribe by tribal resolution, to enter into a self-determination contract or contracts with a tribal organization to plan, conduct, and administer programs or portions thereof . . . ."  25 U.S.C. § 450f(a)(1).  Absent such a contract, however, section 450f does not mandate the payment of money damages.  See Samish Indian Nation, 419 F.3d at 1358, 1365 (holding that "[a]bsent a contract the [Indian Self-Determination Act] does not confer a private damage remedy for" failure to provide contract funding or contract support costs); accord id. at 1366 ("Absent a contract this statutory language and structure is not reasonably read as demonstrating congressional intent to establish a damage remedy under the [Indian Self-Determination Act] for non-payment of the underlying benefits . . . .").  In other words, section 450f is not an independent source of jurisdiction in the Court of Federal Claims.

Moreover, plaintiffs' reliance on a note appended to section 450f is unwarranted.  In 1991, Congress amended the Indian Self-Determination and Education Assistance Act with the following language:

> With respect to claims resulting from the performance of functions during fiscal year 1991 and thereafter, or claims asserted after September 30, 1990, but resulting from the performance of functions prior to fiscal year 1991, under a contract, grant agreement, or cooperative agreement authorized by the Indian Self-Determination and Education Assistance Act of 1975, . . . an Indian tribe, tribal organization or Indian contractor is deemed hereafter to be part of the Bureau of Indian Affairs in the Department of the Interior or the Indian Health Service in the Department of Health and Human Services while carrying out any such contract or agreement and its employees are deemed employees of the Bureau or Service while acting within the scope of their employment in carrying out the contract or agreement: Provided, That after September 30, 1990, any civil action or proceeding involving such claims brought hereafter against any tribe, tribal organization, Indian contractor or tribal employee covered by this provision shall be deemed to be an action against the United States and will be defended by the Attorney General and be afforded the full protection and coverage of the Federal Tort Claims Act . . . : Provided further, That beginning with the fiscal year ending September 30, 1991, and thereafter, the appropriate Secretary shall request

the defendant assume[d] the Tribe's obligations and responsibilities on the project.  The Indian Self-Determination Act recognizes that the government has a "historical and special legal relationship with, and resulting responsibilities to, American Indian people."  25 U.S.C. § 450(a).

Id. at 781.

through annual appropriations funds sufficient to reimburse the Treasury for any claims paid in the prior fiscal year pursuant to the foregoing provisions . . . .

Department of the Interior and Related Agencies Appropriation Act, 1991, Pub. L. No. 101-512, § 314, 104 Stat. 1915, 1959-60 (codified as amended at 25 U.S.C. § 450f note). Two federal appellate courts have held that this language only provides for a money damages remedy against the United States for claims arising under the Federal Tort Claims Act. See Snyder v. Navajo Nation, 382 F.3d 892, 897 (9th Cir. 2004) ("Congress, however, did not intend [this language] to provide a remedy against the United States in civil actions unrelated to the [Federal Tort Claims Act]."); Demontiney v. United States, 255 F.3d 801, 807 (9th Cir. 2001) (holding that this language "applies to tort claims brought under the Federal Tort Claims Act . . . against a contractor who has a self-determination contract"); FGS Constructors, Inc. v. Carlow, 64 F.3d 1230, 1234 (8th Cir. 1995) ("Congress amended the [Indian Self-Determination and Education Assistance Act] to allow recovery under the Federal Tort Claims Act for certain claims arising out of the performance of self-determination contracts."). Moreover, the 638 contracts at issue in this case incorporate this interpretation in the following provision of the annual funding agreements: "For purposes of Federal Tort Claims Act coverage, the Navajo Nation and its employees are deemed to be employees of the Federal government while performing work under this contract." See, e.g., DA 60, 85, 119. Thus, the court finds no reason to depart from this interpretation. Accordingly, because plaintiffs' sole claim for relief is for breach of contract, and does not sound in tort,[20] the note appended to section 450f is inapplicable.[21]

---

[20] Moreover, claims sounding in tort are beyond the scope of this court's jurisdiction. See 28 U.S.C. § 1491(a)(1) (excluding claims sounding in tort from the jurisdiction of the Court of Federal Claims); see also Alves v. United States, 133 F.3d 1454, 1459 (Fed. Cir. 1998) ("To the extent that . . . allegations sound in tort, the Court of Federal Claims lacks jurisdiction under the Tucker Act . . . .").

[21] Plaintiffs contend that the Court of Federal Claims in Carlow held that the note appended to 25 U.S.C. § 450f was a money-mandating source of jurisdiction. Plaintiffs are again mistaken. The court in Carlow only referred to the note by indicating that it:

> suggest[ed] that if the Tribe is deemed to be part of the BIA while carrying out the self-determination contract, the contract entered into by the Tribe with plaintiffs should be protected by a guarantee from the United States. While not directly addressing the retrocession process, this language also supports the theory that pursuant to an Indian self-determination contract the government intends to assume, in the event of retrocession, the legitimate debts of the Tribe on contracts such as the one at issue in the above-captioned case.

40 Fed. Cl. at 782.

Indeed, it is clear that despite plaintiffs' citation to various provisions of, and regulations promulgated under, the Indian Law Enforcement Reform Act and the Indian Self-Determination and Education Assistance Act, their claim is purely contractual in nature.  See Katz v. Cisneros, 16 F.3d 1204, 1207 (Fed. Cir. 1994) ("[W]e look to the true nature of the action in determining the existence or not of jurisdiction.").  The two statutes establish the framework for the contents and execution of the 638 contracts at issue in this case, but without the 638 contracts themselves, plaintiffs would lack a basis for suit in the Court of Federal Claims.  Accordingly, the court turns its attention to the 638 contracts.

## VI.  THE 638 CONTRACTS

### A.  Privity of Contract

The Tucker Act explicitly recognizes that an express or implied contract with the United States can provide the basis for jurisdiction in this court.  28 U.S.C. § 1491(a)(1).  "To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government and entitle the plaintiff to money damages in the event of the government's breach of that contract."  Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990); see also Katz, 16 F.3d at 1210 (noting that a contract between a plaintiff and the United States is "the sine qua non of jurisdiction in the Court of Federal Claims").  In other words, the Tucker Act's waiver of sovereign immunity requires that privity of contract exist between the plaintiff and the government.  Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998).  However, there are several exceptions to this general rule, including suits by intended third-party beneficiaries.  First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999).  In the instant case, plaintiffs' complaint arises from the 638 contracts between the Department of the Interior and the Navajo Nation.  Plaintiffs are not parties to those contracts, and therefore lack privity of contract with the United States.  Accordingly, to establish jurisdiction in this court, plaintiffs must demonstrate that they are intended third-party beneficiaries of the 638 contracts.

### B.  Third-Party Beneficiaries

"In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly."  Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001).  As evidence of intent, the court must consider "the language of the contract itself." Dewakuku v. Martinez, 271 F.3d 1031, 1041 (Fed. Cir. 2001).  "When the intent to benefit the third party is not expressly stated in the contract, evidence thereof may be adduced."  Roedler v. Dep't of Energy, 255 F.3d 1347, 1352 (Fed. Cir. 2001); see also Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997) (noting that if the intended third-party beneficiary is not "specifically or individually identified in the contract," the third party must instead "fall within a class clearly intended to be benefitted thereby").  To find such intent, the court may look to (1) whether the language of the contract demonstrates that "the beneficiary would be reasonable in

relying on the promise as manifesting an intention to confer a right on him," Dewakuku, 271 F.3d at 1041; (2) "the governing statute and its purpose," to the extent that "the contract implements a statutory enactment," Roedler, 255 F.3d at 1352; or (3) "other objective evidence," Flexfab, L.L.C. v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005); see also Stockton E. Water Dist. v. United States, 75 Fed. Cl. 321, 350-51 (2007) (noting that the court permitted testimony from three witnesses regarding whether certain plaintiffs were third-party beneficiaries).  The question of whether a party is an intended third-party beneficiary "is a mixed question of law and fact."  Flexfab, L.L.C., 424 F.3d at 1259.

It is clear from the precedent that in order to determine whether plaintiffs may avail themselves of third-party beneficiary status, the court must first look to the language of the relevant 638 contracts.  Before the court are twelve 638 contracts covering 2002 through 2007: six law enforcement contracts and six criminal investigation contracts.  Cf. supra note 3.  As noted above, five of the six law enforcement contracts and two of the six criminal investigation contracts contained a "No Third-Party Beneficiary" clause expressly providing that the contracting parties–the Department of the Interior and the Navajo Nation–did not, and did not intend to, "create rights in any person(s) or entities other than" themselves.  SA 22, 33, 45, 57, 69, 137, 149.  This plain language concludes the court's inquiry with respect to these contracts–it reflects the contracting parties' intent not to benefit any third parties.  See Dewakuku, 271 F.3d at 1041; Roedler, 255 F.3d at 1352.

The remaining five contracts–the law enforcement contract covering 2002 and the criminal investigation contracts covering 2002 through 2005–lack an express third-party beneficiary provision.  Thus, the court must look to other evidence from which intent to benefit third parties might be adduced.  Plaintiffs offer the following evidence to demonstrate the intent of the Department of the Interior and the Navajo Nation to benefit them: the contracts' "Salaries" provisions; the entire contractual relationship between the Navajo Nation and the United States, as informed by the purpose and requirements of the Indian Self-Determination and Education Assistance Act; an October 1987 statement by the Assistant Secretary for Indian Affairs at the Department of the Interior published in a Senate Report regarding a proposed bill; a Memorandum of Understanding between the United States Attorney General ("Attorney General") and the Secretary of the Interior executed in 1993; interrogatory responses from two Awarding Officials for the relevant 638 contracts; a memorandum appointing an Awarding Official's Technical Representative for one of the 638 contracts at issue; and the deposition testimony of one of the Awarding Officials and one of the Awarding Official's Technical Representatives for the relevant 638 contracts.  This evidence, however, is insufficient to establish plaintiffs as intended third-party beneficiaries of the 638 contracts.

### 1.  The Language of the 638 Contracts

The court turns first to the language of the contracts.  As noted above, the purpose of the 638 contracts at issue was to transfer funding for, and responsibility to perform, law enforcement and criminal investigation services from the United States to the Navajo Nation.  Further, all of

the contracts at issue contain provisions in their statements of work that are substantially identical to the following:[22]

> 101.  The Contractor shall perform the following Bureau program: CRIMINAL INVESTIGATIONS SERVICES [or LAW ENFORCEMENT SERVICES]. Subject to the terms of the Contract, the Annual Funding Agreement, and availability of funds, the Contractor shall perform criminal investigation services [or police law enforcement activities] as noted in the Indian Law Enforcement Reform Act . . . within Navajo Indian Country . . . .

> . . . .

> 102.  Personnel.  The Contractor shall perform the contracted criminal investigation [or law enforcement] program in accordance with the qualification, training, code of conduct, inspection and evaluation, and other standards applicable to Bureau criminal investigations [or law enforcement] personnel, or the equivalent.  . . .

> . . . .

> 106.  Salaries.  Salaries paid criminal investigators [or law enforcement officers] by the Contractor under this Contract shall be equal to or greater than the salaries paid criminal investigators [or law enforcement officers] with similar responsibilities employed directly by the Bureau of Indian Affairs.

> . . . .

> REPORTING

> The Contractor shall prepare and submit the following reports to the Contracting Officer's Representative:

> . . . .

> B.  Internal Reporting Procedures.

> The Contractor will maintain the following information as part of its performance of this Contract, but will not submit this information.  However, this information will be available for inspection during the Bureau's yearly monitoring visit:

> . . . .

---

[22]  Deviations from this language are detailed in the Background section above.

8.  Payroll records of all employees[.]

Plaintiffs allege that the express terms of the contracts, especially the "Salaries" provisions, reflect the contracting parties' intent to benefit them.  Plaintiffs are mistaken.

The promises embodied in the 638 contracts include the Department of the Interior's promise to pay the Navajo Nation a specified amount of money to be used for law enforcement or criminal investigation services and the Navajo Nation's promise to the Department of the Interior to perform those services.  In other words, the principal purpose of the contracts is the provision of law enforcement and criminal investigation services for the Navajo Nation.  Thus, the contract language evinces the intent of the contracting parties to benefit the Navajo Nation as a whole, and not individual members or employees of the Navajo Nation.

The court's conclusion is consistent with the opinion of the Court of Federal Claims in Christos v. United States, which concerned contracts between the United States Department of Energy ("Department of Energy") and Westinghouse Savannah River Company ("Westinghouse") to manage and operate a defense nuclear facility.  48 Fed. Cl. 469, 471 (2000).  The contracts provided that Westinghouse was entitled to reimbursement from the Department of Energy for certain described personnel costs, including costs expended for severance pay.  Id. at 472-73.  When the plaintiffs, former employees of Westinghouse, were informed that they were going to be laid off, they elected instead to retire pursuant to a plan offered by Westinghouse's parent corporation, and all but one signed a waiver of entitlement to severance pay.  Id. at 473-74.  However, Westinghouse requested and received reimbursement for the plaintiffs' severance pay from the Department of Energy.  Id. at 474.  Believing that they were entitled to the severance pay for which Westinghouse received reimbursement, the plaintiffs brought suit against the United States, contending that they were third-party beneficiaries of the contracts.  Id. The Court of Federal Claims adopted the reasoning of the United States Court of Appeals for the Fourth Circuit, which, in analyzing the same severance pay provision, concluded that the provision merely "'represented an agreement that severance payments'" would be reimbursed by the Department of Energy, and that the contracts contained no indication that the provision "'was intended to create a direct benefit to laid-off employees . . . .'"  Id. at 477 (quoting Stokes v. Westinghouse Savannah River Co., 206 F.3d 420, 429 (4th Cir. 2000)).  Accordingly, it held that the plaintiffs could "not assert third-party beneficiary status as an exception to the privity requirement because they are merely incidental beneficiaries" of the severance pay provisions.  Id. at 477-78.  In other words, the contacts were meant to benefit Westinghouse as a whole, and not its individual employees.  Of course, one distinguishing factor between the circumstances described in Christos and the circumstances in the case at bar is the unique relationship that the United States has with Native Americans.  The court addresses this relationship below.

### 2.  The Governing Statute and Its Purpose

Plaintiffs contend that beyond the express language of the 638 contracts, evidence of their third-party beneficiary status can be adduced from the purpose and requirements of the statute

that defines the contractual relationship between the Navajo Nation and the United States, the Indian Self-Determination and Education Assistance Act.  As noted previously, the purpose of the Indian Self-Determination and Education Assistance Act was to maintain "the Federal Government's unique and continuing relationship with, and responsibility to, individual Indian tribes and to the Indian people as a whole through the establishment of a meaningful Indian self-determination policy . . . ."  25 U.S.C. § 450a(b); see also United States v. Mitchell, 463 U.S. 206, 225 (1983) (noting that there is "an undisputed existence of a general trust relationship between the United States and the Indian people" and that it "has previously emphasized 'the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people.'" (quoting Seminole Nation v. United States, 316 U.S. 286, 296 (1942))).  The "Indian self-determination policy" was intended to "permit an orderly transition from the Federal domination of programs for, and services to, Indians to effective and meaningful participation by the Indian people in the planning, conduct, and administration of those programs and services."  25 U.S.C. § 450a(b).

One of the vehicles used for transferring the programs and services to tribes are self-determination contracts.  See generally id. §§ 450f-450n.  Every self-determination contract must contain certain, specified provisions.  Id. § 450l(c).  Moreover, self-determination contracts for law enforcement and criminal investigation services must include additional provisions.  See, e.g., 25 C.F.R. § 12.34 (mandating that such contracts "require a law enforcement officer to be paid at least the same salary as a BIA officer performing the same duties").

There is no question that the United States has a special trust responsibility to the Navajo Nation and a corresponding obligation to assist the Navajo Nation in planning, conducting, and administering programs and services that benefit the tribe.  It is equally clear that the Department of the Interior and the Navajo Nation have entered into a comprehensive contractual arrangement for the provision of law enforcement and criminal investigation services.  Indeed, the common theme running through the statutory and contractual language is the United States' unremitting intent to benefit Native Americans and Native American tribes, like the Navajo Nation, as a whole.  However, there is no such clear intent to benefit individual members or employees of the Navajo Nation or other tribes.  See also Demontiney v. United States, 54 Fed. Cl. 780, 791 ("The BIA's traditional role of protector and guardian of Native American interests, and involvement with Tribal organizations in self-determination contracts, does not place the BIA in privity of contract with contractors with which Tribal organizations contract.").  Thus, the court must consider whether any of the other evidence submitted by plaintiffs reflects the intent of the parties to the 638 contracts to benefit them.

### 3.  Other Objective Evidence

Plaintiffs contend that their intended third-party beneficiary status can be demonstrated by a variety of documentary and testimonial evidence.  They first submit a statement prepared in 1987 by the Assistant Secretary for Indian Affairs at the Department of the Interior included in the legislative history of a proposed bill to amend the Indian Self-Determination and Education

Assistance Act.  See S. Rep. No. 100-274, at 43-44 (1987).  The Assistant Secretary's main concern was the problems associated with the use of contracts to transfer responsibility and funds to tribes for programs and services that benefit them.  Id. at 43.  One such problem he identified was the "BIA's need to monitor the contractor while the contract [was] being carried out . . . ."  Id. at 44.  However, nowhere does the Assistant Secretary address whether self-determination contracts in general, or self-determination contracts for the provision of law enforcement and criminal investigation services specifically, were intended to benefit individual members or employees of tribes.  Id. at 43-44.  In addition, the statement was issued more than fourteen years prior to the effective date of the 638 contracts at issue in this case and therefore cannot be seen to apply to them.  Thus, the Assistant Secretary's statement does not support plaintiffs' position.

Plaintiffs next submit a Memorandum of Understanding executed in 1993 by the Attorney General and the Secretary of the Interior.  The purpose of the Memorandum of Understanding was "to establish guidelines regarding the respective jurisdictions of the [BIA] and the Federal Bureau of Investigation . . . in certain investigative matters, and to provide for the effective and efficient administration of criminal investigative service in Indian Country."  Mem. Understanding § I.  Under the heading "General Provisions," the Memorandum of Understanding specifically provided:

> 4.  Any contracts awarded under the Indian Self-Determination Act to perform the function of the BIA, Branch of Criminal Investigators, must comply with all standards applicable to the Branch of Criminal Investigators, including the following:
>
> . . . .
>
> c.  Compensation for Criminal Investigators must be comparable to that of BIA Criminal Investigators.
>
> . . . .
>
> n.  Tribal contractors must agree, and the BIA shall ensure, that there is an audit and evaluation of the overall contracted Criminal Investigator program at least every two years.  Continuation of the contract shall be contingent upon successful completion of each audit and evaluation.
>
> . . . .

The provisions set forth in this [Memorandum of Understanding] are solely for the purpose of internal guidance of components of the Department of the Interior and the Department of Justice.  This [Memorandum of Understanding] does not, is not intended to, shall not be construed to, and may not be relied upon to, create any

-23-

substantive or procedural rights enforceable at law by any party in any matter, civil, or criminal.

Id. § IV.  In a prior ruling on one of plaintiffs' discovery motions, the court held that the Memorandum of Understanding does not constitute objective evidence of an intent of the parties to the 638 contracts to benefit plaintiffs.  See Ruling Pls.' Disc. Mots. 7, Sept. 24, 2008.  The court explained:

> [T]he Memorandum of Understanding expressly prohibits any party to a civil or criminal action from relying upon any of its terms to create any legally enforceable substantive or procedural rights.  This plain and unambiguous language expressly precludes plaintiffs from relying on the Memorandum of Understanding to establish their third-party beneficiary status–a procedural right.
> . . .
>
>       Moreover, even if this restrictive provision were not part of the Memorandum of Understanding, plaintiffs have provided no indication that this document, signed in 1993, remained operative when the contracts at issue in this case . . . were executed.

Id. (citation omitted).  Plaintiffs have provided this court with no reason to revisit its prior ruling.[23]

The third piece of objective evidence submitted by plaintiffs in support of their intended third-party beneficiary claim are interrogatory responses provided by two of the Awarding Officials for the 638 contracts–Sharon Pinto and Dolores F. Torrez.  The interrogatories and combined responses cited by plaintiffs are as follows:

---

[23]  In their supplemental response brief, plaintiffs argue that they are only submitting the Memorandum of Understanding to demonstrate that the Attorney General and the Secretary of the Interior interpreted the "Salaries" provision to require that criminal investigators hired by tribes be paid at the same rate as equivalent BIA criminal investigators.  While it is undoubtedly true that the Attorney General and the Secretary of the Interior understood the controlling statutory language to require such equal pay, there is no evidence that they were drawing any conclusions about the ability of criminal investigators hired by tribes to enforce self-determination contracts as third-party beneficiaries.  Plaintiffs are confounding two inquiries: (1) whether the relevant statutes, regulations, and contracts required them to be paid at the same rate as equivalent BIA employees and (2) whether the relevant 638 contracts reflect an intent to benefit them.  A positive response to the former inquiry does not lead to a positive response to the latter inquiry.

Interrogatory No. 2:

As the awarding official of the 638 Law Enforcement Contract, explain your understanding of contract provision 106: "Salaries" contained in the document[']s statement of work . . . .

Ms. Pinto's Response to Interrogatory No. 2:

The Statement of Work is the statement of the Navajo Nation regarding the work that it intended to perform under its contracts with the [BIA].  Pursuant to provision 106, the Navajo Nation agreed to pay its law enforcement officers salaries equal to or greater than the salaries of BIA law enforcement officers.  The Navajo Nation's agreement to do so, however, was subject to the availability of funds, pursuant to provision 101 of the Statement of Work.  . . .

Ms. Torrez's Response to Interrogatory No. 2:

The Statement of Work is the statement of the Navajo Nation regarding the work that it intended to perform under its contracts with the [BIA].  Pursuant to paragraph 106 . . . , the Navajo Nation stated its intention to pay its law enforcement officers salaries equal to or greater than the salaries of BIA law enforcement officers.

Provision 106 of the Statement of Work must, however, be read in light of several other provisions of the agreement.  My understanding of the package of agreements is that, in case of conflicts, the Model Contract took priority over the Annual Funding Agreement which took priority over the Statement of Work.  Paragraph A.2 of the Model Contract . . . states "each provision of this Contract shall be liberally construed for the benefit of the Contractor."  Paragraph B.5 of the Model Contract . . . states that the Navajo Nation is required to notify the BIA if it does not have sufficient funds to carry out the contract.  Paragraph B.5 . . . also permits the Navajo Nation to suspend work under the contract in case of insufficient funding.  Paragraph B.11 of the Model Contract . . . states that the Navajo Nation is not required to adhere to program guidelines, manuals, or policy directives of the BIA.  Paragraph 2.A of the Annual Funding Agreement . . . shows that the law enforcement program was an integrated program involving funding from the BIA and other sources, and the Nation was permitted to use this funding as it saw fit.  Paragraph 8 of the Annual Funding Agreement . . . makes clear that personnel must adhere to Navajo Nation personnel policies, pay schedules, and pay tables.

In light of all these provisions, my understanding of Paragraph 106 of the Statement of Work is that it expresses the intention of the Navajo Nation to pay its

law enforcement officers the same as their BIA counterparts, but they were permitted to adhere to another pay schedule or pay table as long as the Navajo Nation adhered to its own personnel policies, pay schedules, and pay tables and followed the procedures of its personnel office in doing so.

Interrogatory No. 4:

     In the attached Law Enforcement Contracts['] provision 106: Salaries, who does the first "Law Enforcement officers" phrase pertain to?  . . .

Ms. Pinto's and Ms. Torrez's Identical Response to Interrogatory No. 4:

     "Law Enforcement officers" in provision 106 of the Statement of Work referred to law enforcement officers employed by the Navajo Nation pursuant to the 638 Law Enforcement Contracts containing the Statement of Work.

See Def.'s Resps. & Objections Pls.'s First Set Interrogs. (Pinto) 4-6; Def.'s Am. Resps. & Objections Pls.'s First Set Interrogs. (Torrez) 4-7.  Plaintiffs characterize their interrogatories as asking whether plaintiffs were intended third-party beneficiaries of the 638 contracts.  The court does not read the interrogatories in the same way.  As asked, and answered, the interrogatories appear to be designed to elicit the Awarding Officials' interpretation of the "Salaries" provision in general, and not whether the provision, or the contract as a whole, reflected an intent to benefit plaintiffs.  Indeed, the responses from Ms. Pinto and Ms. Torrez indicate that they understood the "Salaries" provision to require equal pay and that the provision had to be read in conjunction with other provisions in the relevant contract, but contain no opinion on whether employees of the Navajo Nation were meant to directly benefit from the 638 contracts.  As noted above, plaintiffs are confounding two inquiries: (1) whether the relevant statutes, regulations, and contracts required them to be paid at the same rate as equivalent BIA employees and (2) whether the relevant 638 contracts reflect an intent to benefit them.  The interrogatory responses contain no support for plaintiffs' third-party beneficiary claim.

     Similarly, the final two pieces of evidence submitted by plaintiffs, which generally concern how the BIA monitored compliance with the provisions of the 638 contracts, lack any bearing on plaintiffs' intended third-party beneficiary claim.  Specifically, plaintiffs submit a copy of a memorandum designating an Awarding Official's Technical Representative and describing the individual's responsibilities and duties.  The memorandum provides, in relevant part:

     The duties and responsibilities of the [Awarding Official's Technical Representative] shall include, but are not limited to, the following:

     . . . .

(b)  Prepare a plan for monitoring the contract and submit it to the Awarding Official within 45 calendar days of receipt of the designation memorandum.

. . . .

(d)  Advise the tribal organization of any violation of the contract terms and provisions and promptly bring the matter to the attention of the Awarding Official if the tribal organization fails or is unable to correct or stop the violation.

DA 27.  Plaintiffs also submit excerpts from the depositions of Ms. Torrez and one of the Awarding Official's Technical Representatives, Ivan Bowekaty.  The testimony concerned the duties of both individuals to monitor contract compliance; their familiarity with the relevant statutes, regulations, and contract terms; their interpretation of the "Salaries" provision; whether the Navajo Nation was in compliance with the "Salaries" provision; and the consequences of violating the "Salaries" provision.  See generally Bowekaty Dep., June 5, 2009; Torrez Dep., June 5, 2009.  Plaintiffs argue that all of this evidence establishes that they were entitled to be paid at the rate equal to that received by their BIA counterparts.

As a threshold matter, the court must address plaintiffs' apparent underlying argument that the conduct of the individuals responsible for monitoring contract compliance and ensuring that the contracting parties did not violate the terms of the contracts is relevant to whether the parties to the 638 contracts intended plaintiffs to benefit from the contracts.  In ruling on one of plaintiffs' prior discovery motions, the court commented on this argument:

While course of conduct may be relevant, plaintiffs have failed to provide any legal support for the application of this principle to this case.  Moreover, plaintiffs have not alleged that any of the terms of the contract, including the payment term, is ambiguous, which is a predicate for the court's consideration of extrinsic evidence.  See TEG-Paradigm Envtl., Inc. v. United States, 465 F.3d 1329, 1338 (Fed. Cir. 2006) ("When the contract's language is unambiguous it must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions.").

Ruling Pls.' Supplemental Mot. Compel Disc. 8, Mar. 17, 2009.  The court then noted that if plaintiffs wanted to pursue this line of argument, they must provide some legal support:

[I]f plaintiffs ultimately fail to provide such legal support in their supplemental briefing, the court will be unable to credit any purported evidence concerning contract compliance and enforcement activities when ruling on the third-party beneficiary issue.  To date, plaintiffs have failed to cite case law (or other legal sources) that supports their proposition that contract performance can constitute evidence of intended third-party beneficiary status.  Plaintiffs state a general legal

proposition, but more is required.  If discovery yields evidence supporting plaintiffs' legal theory, plaintiffs should not rest on bald assertions of legal principles, but rather provide concrete examples supporting those assertions.

Id. at 9 n.5.  In their supplemental response brief, plaintiffs generally aver that "[t]he course of conduct of parties to any contract is evidence of its meaning."  Pls.' Supplemental Resp. Mot. Dismiss 10.  In support of this proposition, they cite the Supreme Court's decision in O'Connor v. United States, 479 U.S. 27, 33 (1986), as well as sections 202(4) and 203 of the Restatement (Second) of Contracts.  Plaintiffs advanced precisely the same proposition and legal support in their November 12, 2008 motion to compel, well before the court issued its March 17, 2009 discovery ruling quoted above.  The court requested more from plaintiffs.  Instead, plaintiffs offer no analysis of their general proposition, and do not attempt to apply it to the facts of this case. They do not explain how evidence of contract monitoring and compliance activities demonstrate that the parties to the 638 contracts intended to benefit them.  Moreover, the supplied evidence addresses the actions of only one party to the contract–the BIA–and not both parties as would be necessary to ascertain the course of conduct of the "parties."  Accordingly, the court will not consider the proffered evidence in this light.

Considering the proffered memorandum and deposition testimony independently, the court finds that they offer no support for plaintiffs' claim that they are intended third-party beneficiaries of the 638 contracts.  In fact, in none of the deposition excerpts in the record before the court do the deponents opine whether plaintiffs were intended third-party beneficiaries. Instead, as with the other evidence submitted by plaintiffs, the focus is on whether the relevant statutes, regulations, and contracts required the Navajo Nation to pay them at the same rate as equivalent BIA employees.  This is insufficient to establish intended third-party beneficiary status.

### 4.  Conclusion

To establish intended third-party beneficiary status, plaintiffs were required to show that the 638 contracts reflected an express or implied intent to benefit them directly.  Glass, 258 F.3d at 1354.  Plaintiffs argued that the contracts themselves provided the necessary evidence, that the statutes governing the content and execution of the contracts provided additional proof, and that other objective evidence further solidified their contention.  However, the evidence offered by plaintiffs does not demonstrate that the 638 contracts reflected an intent to benefit them directly. Instead, plaintiffs' evidence is geared toward demonstrating that the relevant statutes, regulations, and contracts required them to be paid at the same rate as their BIA counterparts.  Assuming this to be true, it does not lead to the conclusion that plaintiffs can recover their unpaid wages and benefits from the United States by suing as third-party beneficiaries of the relevant 638 contracts. Plaintiffs' true complaint is with their employer, the Navajo Nation, for a failure to pay them the salaries and provide them with the benefits required by statute.  In sum, the court concludes that

plaintiffs are not intended third-party beneficiaries of the 638 contracts at issue here. Accordingly, their complaint must be dismissed.[24]

## VII.  CLAIM PRECLUSION

Although the court has resolved defendant's motion to dismiss on the basis of jurisdiction, the court will briefly address defendant's contention that plaintiffs' complaint is barred by the doctrine of claim preclusion.  "Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit.  Claim preclusion therefore encompasses the law of merger and bar."  Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 77 n.1 (1984).  Defendant asserts that plaintiffs failed to raise their third-party beneficiary breach of contract claim in prior litigation, even though they had the opportunity to do so.  The court takes judicial notice of the proceedings in the previous litigation, and briefly describes it below.  See Fed. R. Evid. 201(b)(2); Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999) ("In deciding whether to dismiss a complaint under Rule 12(b)(6), the court may consider matters of public record.").

The prior litigation arose in the United States District Court for the District of Arizona ("District Court") in 2002.  The thirty-six plaintiffs in the consolidated cases in the District Court are also plaintiffs in the instant suit.[25]  Compare Am. Compl., with Snyder, 382 F.3d at 897.  In the District Court, the plaintiffs alleged that the Navajo Nation and the United States–both named defendants–violated the FLSA by, among other things, failing to pay them at the same rate as their BIA counterparts.  Snyder, 382 F.3d at 894.  The District Court "dismissed the claims against the Navajo Nation, holding that law enforcement was an intramural matter . . . , and that the FLSA therefore did not apply to plaintiff law enforcement officers."  Id.  It also dismissed the claims against the United States.  Id.  It appears that the District Court's dismissals were for lack of jurisdiction because the court denied the plaintiffs' subsequent motion for relief from judgment "without prejudice to the filing of a new case."  Order 2, Synder v. Navajo Nation, Nos. 02-0308, 02-1627 (D. Ariz. Dec. 19, 2005).  On appeal, the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit") affirmed the District Court's dismissals.  Snyder, 382 F.3d at 894, 897.  With respect to the claims against the United States, the Ninth Circuit noted that the "tenuous link" between the plaintiff-appellants and the government involved "the tribe's

---

[24]  Because plaintiffs are not intended third-party beneficiaries of the 638 contracts at issue here, it is unnecessary for the court to address their contention that the contracts create a nondelegable duty on the part of the BIA to enforce the "Salaries" provision of the contract.

[25]  The court notes that the names of two of these thirty-six plaintiffs are spelled differently in the instant suit.  Plaintiffs in the instant suit include Kirk Snyder and Bernadine Dodson, whereas these individuals are referred to as Kurt Snyder and Bernadine Dobson in the District Court litigation.

self-determination contract and a statutory provision that limits the tort liability of the tribe for employees' torts." Id. at 896 (referring to 25 U.S.C. § 450f note).  In response to the plaintiff-appellants' contention that the note appended to 25 U.S.C. § 450f meant that "they [were] employees of the BIA for all purposes and [could] properly bring their FLSA suit against the United States," the court held that Congress did not intend for the note "to provide a remedy against the United States in civil actions unrelated to the [Federal Tort Claims Act]" and that therefore the United States was "an inappropriate party" to the suit.  Id. at 897.

While the appeal in Snyder was pending before the Ninth Circuit, another suit was filed in the District Court.  All sixty-five plaintiffs in this second District Court suit are also plaintiffs in the instant suit.[26]  Compare Am. Compl., with Compl., Henderson v. Navajo Nation, No. 03-2162 (D. Ariz. Nov. 5, 2003).  The plaintiffs once again alleged that the Navajo Nation and the United States violated the FLSA by, among other things, failing to pay them at the same rate as their BIA counterparts.  See generally Compl., Henderson.  The District Court concluded that "[t]he factual foundation, as well as the substantive allegations, in the Snyder and Henderson cases [were] identical."  Order, Henderson (D. Ariz. June 17, 2004).  Accordingly, based on the Ninth Circuit's decision in Snyder, the District Court dismissed the claims against both defendants, apparently for lack of jurisdiction.  Id.  On appeal, the Ninth Circuit summarily affirmed the District Court's dismissals.  See Order, Henderson v. Navajo Nation, No. 04-16635 (9th Cir. Dec. 15, 2004).

Returning to the instant case, defendant argues that the Snyder and Henderson litigation serves to preclude plaintiffs' third-party beneficiary breach of contract claim.  For claim preclusion to apply, a three-prong test must be satisfied.  "[T]here must be (1) an identity of parties or their privies, (2) a final judgment on the merits of the prior claim, and (3) the second claim must be based on the same transactional facts as the first and should have been litigated in the prior case."  Sharp Kabushiki Kaisha v. Thinksharp, Inc., 448 F.3d 1368, 1370 (Fed. Cir. 2006) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 327 n.5 (1979)).  It appears that all but fourteen of the plaintiffs in the instant suit were plaintiffs in either Snyder or Henderson.[27]  And, it appears that the instant case is based on the same transactional facts as the litigation in Snyder and Henderson.  However, the plaintiffs in the Snyder and Henderson litigation never had the opportunity to flesh out any claims for breach of contract (as third-party beneficiaries or otherwise) because the District Court dismissed both actions on jurisdictional grounds.  The

---

[26]   The court notes that the names of two of these sixty-five plaintiffs are spelled differently in the instant suit.  Plaintiffs in the instant suit include Elrens C. Henio and Erwin Toddy, whereas these individuals are referred to as Elreno C. Henio and Erwin Todd in the District Court litigation.

[27]   The fourteen new plaintiffs include: Jeremiah Dee, Harry Sombrero, Darlene James, Robert Platero, Samantha A. Yazzie, Calvin R. Brown, Ericson Yazzie, Wendell L. Bitselley, Derryck C. Begaye, Travis Silversmith, Gordon Toadlena, Jonathan L. Billie, John Billison, and Jefferson Lilly.

court must exercise caution when applying the doctrine of claim preclusion to bar a party's claims.  As the Federal Circuit explained in Kearns v. General Motors Corp.:

> When applying res judicata to bar causes of action that were not before the court in the prior action, due process of law and the interest of justice require cautious restraint.  Restraint is particularly warranted when the prior action was dismissed on procedural grounds.
>
>         . . . .
>
>         . . . . Res judicata does not automatically apply to claims that might have been included in the prior complaint; it must be shown that they necessarily were included in the judgment, and that the interest of justice is not disserved by applying res judicata to claims that were never presented for adjudication.
>
>         . . . .
>
>         . . . . Precedent cautions that res judicata is not readily extended to claims that were not before the court, and precedent weighs heavily against denying litigants a day in court unless there is a clear and persuasive basis for that denial.

94 F.3d 1553, 1556-57 (Fed. Cir. 1996) (citation omitted).  Indeed, the Supreme Court has noted the importance of allowing litigants to have "an adequate opportunity to litigate disputed issues of fact . . . ."  Kremer v. Chem. Constr. Corp., 456 U.S. 461, 485 n.26 (1982); see also Sharp Kabushiki Kaisha, 448 F.3d at 1372 ("[W]hen a party did not have an opportunity to litigate disputed issues, a decision to permit such litigation is favored.").  The court is not willing to give the judgments in Snyder and Henderson preclusive effect in this case because the plaintiffs in the previous litigation lacked the opportunity to argue their claims on the merits.  Thus, if the court had not resolved defendant's motion to dismiss on the basis of jurisdiction, it would have rejected defendant's claim preclusion argument.

## VIII.  CONCLUSION

As set forth above, the court **GRANTS** defendant's motion to dismiss and **DISMISSES** plaintiffs' claims for lack of jurisdiction.  No costs.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge